**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 14-1853**

FIRST SOUTH BANK,

                Plaintiff - Appellant,

       v.

FIFTH THIRD BANK NA, d/b/a Fifth Third Bank, formerly known
as First Charter Bank, formerly known as First Charter
Corporation; FIRST CHARTER BANK; FIRST CHARTER CORPORATION,

                Defendants - Appellees.

**No. 14-1917**

FIRST SOUTH BANK,

                Plaintiff - Appellee,

       v.

FIFTH THIRD BANK NA, d/b/a Fifth Third Bank, formerly known
as First Charter Bank, formerly known as First Charter
Corporation; FIRST CHARTER BANK; FIRST CHARTER CORPORATION,

                Defendants - Appellants.

Appeals from the United States District Court for the District
of South Carolina, at Spartanburg.  Mary G. Lewis, District
Judge.  (7:10-cv-02097-MGL)

Argued:  October 28, 2015        Decided:  November 20, 2015

Before NIEMEYER and MOTZ, Circuit Judges, and M. Hannah LAUCK, United States District Judge for the Eastern District of Virginia, sitting by designation.

———————————

Affirmed by unpublished per curiam opinion.

———————————

**ARGUED:** Robert F. Goings, GOINGS LAW FIRM, LLC, Columbia, South Carolina, for Appellant/Cross-Appellee. William H. Hurd, TROUTMAN SANDERS, LLP, Richmond, Virginia, for Appellees/Cross-Appellants. **ON BRIEF:** Joel W. Collins, Jr., COLLINS AND LACY, P.C., Columbia, South Carolina, for Appellant/Cross-Appellee. Frank H. Gibbes, III, GIBBES BURTON, LLC, Spartanburg, South Carolina; Alan J. Statman, STATMAN HARRIS & EYRICH LLC, Cincinnati, Ohio, for Appellees/Cross-Appellants.

———————————

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Pursuant to the invitation of a Charlotte, North Carolina, branch of Fifth Third Bank,[*] First South Bank, of Spartanburg, South Carolina, agreed to participate with Fifth Third in the $11 million financing of a real estate project in Lincoln County, North Carolina, by providing $4 million of the financing. The project, which involved the construction of 204 lots for single family houses, was being developed by Burton Creek Investment, LLC.

Fifth Third represented in documents given to First South, among other things, that 79% of the lots had been prepurchased; that Burton Creek was required, as a condition of the loan, to provide "letters from the applicable utility companies or governmental authorities confirming that all utilities necessary for the Improvements [on the 204 lots] [were] available at the Land in sufficient capacity, together with evidence satisfactory to Bank of paid impact fees, utility reservation deposits, and connection fees required to assure the availability of such services"; that the five individual partners of Burton Creek would guarantee the loan; and that Carlton and Carol Tyson, the

_____

[*] Fifth Third Bank is the successor by a June 2008 merger with First Charter Bank, of Charlotte, North Carolina, and before then, First Charter was the bank involved in the transactions in this case. For clarity, we refer to Fifth Third and First Charter collectively as Fifth Third.

3

parents of one of the partners, would provide a limited guaranty for $2.1 million. Through a participation agreement between Fifth Third and First South, Fifth Third, as lead lender, agreed to obtain at closing the executed guaranty agreements and evidence of the utility approvals.

The loan closed on March 8, 2007, and the closing documents represented that Fifth Third received both the utility approvals and executed guaranty agreements. Shortly after closing, Fifth Third disbursed roughly $5 million of the loan to Burton Creek, and after First South received a package of closing documents, it disbursed roughly $1.85 million. While the closing package did not contain a copy of the Tysons' Guaranty Agreement, Fifth Third later provided First South with a copy that was dated and executed before a notary public on March 8, 2007, the date of closing. And while the closing package did not contain the utility approval letters, Fifth Third indicated on the closing checklist that they had been received.

In January 2008, as the national economy began to collapse, Burton Creek informed Fifth Third that the prepurchasers of the lots began to back out, stalling the project. Also, Burton Creek advised Fifth Third that Lincoln County officials had reduced the sewer taps available by more than one-half, to 74 lots. Several months later, in October 2008, Fifth Third declared Burton Creek in default.

4

As it turned out, the developer Burton Creek had been told before closing that because of demands on the Lincoln County sewer system, the County would have to reduce significantly the number of sewer taps it could approve for the project. As a consequence, Fifth Third never received evidence of Lincoln County's utility approvals for 204 lots, as represented in the closing documents. In addition, it turned out that Carlton Tyson never executed the $2.1 million loan Guaranty Agreement as represented by Fifth Third. Fifth Third had a notary in its office witness the Tysons' signatures, but the notary stated at trial that the Tysons never appeared before her to sign the documents; she was simply presented with a signed copy to notarize. Indeed, an email exchange between Fifth Third and Burton Creek a few days after the closing indicated that the Tysons' Guaranty Agreement had not then been executed, despite the closing date that appeared on the notarization. And Carlton Tyson testified at trial that he never signed the Guaranty Agreement, that he did not authorize anyone to sign it on his behalf, and that the signature on the Guaranty Agreement was not his.

First South commenced this action and, with its second amended complaint, alleged, among other claims, breach of contract, fraud, and violation of the North Carolina Unfair and Deceptive Trade Practices Act ("NCUDTPA"), N.C. Gen. Stat.

5

§ 75-1.1.  In its prayer for relief, First South sought, among other relief, both rescission and damages for breach of contract and fraud.

Before trial, the district court advised First South that First South could not "have it both ways" -- i.e., that it could not both affirm the contract and thereby claim damages for its breach and for fraud in the inducement and at the same time rescind the contract.  First South elected rescission, demanding only that the monies it had advanced be restored to it less credits it had already received, a sum that the parties stipulated was $2,764,232.46.  The parties also agreed that the court, not the jury, would try the NCUDTPA claim, based on the jury verdict.

The jury returned a verdict in favor of First South and awarded it the stipulated amount of $2,764,232.46.  Because the district court concluded, among other things, that the jury was, with that award, effecting rescission and not awarding damages, it ruled against First South on its NCUDTPA claim, which allows treble damages only with respect to an award of damages.  See Winant v. Bostic, 5 F.3d 767, 776-77 (4th Cir. 1993).  More particularly, the court concluded first that South Carolina law applied to this action and therefore First South did not have a claim under NCUDTPA, a North Carolina law.  It also concluded that even if First South had made a claim under the analogous

6

South Carolina Unfair Trade Practices Act ("SCUTPA"), it failed to prove "actual damages," as required under the SCUTPA to obtain treble damages. See S.C. Code Ann. § 39-5-140. The court noted that instead of seeking "actual damages," First South only sought rescission. Finally, the court concluded that if the NCUDTPA applied, again First South did not seek damages, but rather rescission, precluding it from recovering treble damages under the specific language of the NCUDTPA. See Winant, 5 F.3d at 776-77.

First South appealed and now contends that the district court erred in ruling against it on the NCUDTPA claim, arguing that the jury awarded it damages, thus justifying a treble damages award for the fraud that the jury found. First South also contends that the district court erred in refusing to award it prejudgment interest. Fifth Third cross-appealed and contends that the evidence against it was insufficient to support the jury's verdict on fraud and breach of contract and that the district court erred in granting First South roughly $8,000 in experts' costs when the experts themselves never testified at trial.

The principal issue in this case centers on whether First South elected rescission and whether the consequences imposed by the court on it because of that election were appropriate. In essence, First South contends that it elected to seek

7

"rescissionary damages" and that the jury in fact gave it what it requested, filling in its verdict on a line labeled "damages." It points out that throughout the proceedings, it referred repeatedly to its claim for "damages," thereby suggesting that it was not in fact pursuing rescission.

While the language used by First South's attorneys -- <u>i.e.</u>, "rescissionary damages" -- was peculiar, the record supports the district court's conclusion that First South indeed elected rescission and that the case was presented, argued, and decided as a rescission case. First, before trial, the court advised First South that it had to make an election:

> I've said this before. I think there's going to have to be an election. I don't think you can sue and say put me back where I would be if the contract hadn't even happened. I want all my money back. Oh, and I also want damages for breach of that contract that I basically want nullified. I don't think you can do both of those.

In response, First South elected rescission, stating, "Our damages are purely, one hundred percent rescissionary damages, whether or not it's a breach of contract or it's fraud." After explaining that its claim for "rescissionary damages" was essentially a claim for "rescission," First South left no doubt about this, stating:

> The damages we seek are essentially our money back and to restore us in the position we were prior to signing the contract. <u>We're not seeking actual damages</u> that are above rescission or our money back. The proper measure of damages encompasses damages to restore

8

First South Bank in a condition in its original place as if the misrepresentations and the fraud and the material breach had not occurred and that the agreement had not been reached.

(Emphasis added). Not only was the election unambiguous, the case was thereafter presented to the jury as a rescission case, and First South never placed that fact in question. When First South presented its case to the jury after presenting all the evidence, it directed the jury to the line of the verdict form labeled "damages" and explained, "And the damages are, simply put, our money back. We're not asking for anything more or anything less than a refund. And this is the amount of the refund." Finally, the district court, without any objection from First South, instructed the jury on rescission, stating:

[T]he plaintiff had to prove . . . that the plaintiff timely elected to cancel the contract.

\* \* \*

[T]he plaintiff must show that the plaintiff has restored to, offered to restore to, credited or in a position to restore so much of the consideration it received from the defendant as would be fair and equitable under the circumstances. Once a contract is canceled, both the plaintiff and the defendant must be returned to same relative positions they occupied immediately preceding the formation of the contract.

\* \* \*

As I stated earlier, the plaintiff in this case seeks recovery in the form of rescission. Specifically, the plaintiff seeks to recover back the monies it has parted with because of the contract at issue.

9

And consistent with rescission, the parties agreed to the amount of refund -- the amount that First South parted with -- and the jury, in finding for First South, awarded that stipulated amount.

Because First South pursued its case for rescission and the jury award represented the refund of what it had advanced, it did not receive a damage award. Yet a damage award is what is necessary to receive an award of treble damages under the NCUDTPA. See Winant, 5 F.3d at 776-77 ("By the terms of [N.C. Gen. Stat.] § 75-16, only 'if damages are assessed' is the amount trebled. Because damages were not assessed, but rescission elected, we conclude the amount should not have been trebled"). Similarly, a plaintiff may only bring an action under the SCUTPA "to recover actual damages." S.C. Code Ann. § 39-5-140; see also Fields v. Yarborough Ford, Inc., 414 S.E.2d 164, 166-67 (S.C. 1992) (explaining that a plaintiff must prove it suffered "actual damages" to recover under the SCUTPA, and that because the "two remedies [an action for damages and an action for rescission] are inconsistent," the plaintiff "cannot in the one form of action secure the relief appropriate to the other" (alteration in original) (internal quotation marks and citation omitted)).

In short, we conclude that the district court correctly found that First South had elected rescission and thereby waived

10

its claims for damages. The court also correctly concluded that First South's unfair trade practices claim, under either the NCUDTPA or the SCUTPA, must therefore fail.

We also reject First South's argument that the district court improperly denied its claim for prejudgment interest. The district court noted that prejudgment interest of $231,467.22 was included in the sum to which First South stipulated at trial as the amount of refund due it. The court correctly explained that because the stipulated sum included interest, any award of additional prejudgment interest would amount to a windfall.

As to Fifth Third's cross-appeal, Fifth Third contends first that the evidence was insufficient to support the jury's verdict. We reject this argument. Our review of the record shows that ample testimony was presented to support the verdict. In essence, the jury could well have found that Fifth Third deliberately deceived First South into believing that at closing Fifth Third had received letters approving utilities and the properly executed $2.1 million Guaranty Agreement from the Tysons, when in fact it had received neither and it knew or was reckless in not knowing that it had received neither. These false representations were material to the risk that First South believed it was accepting in entering into the participation agreement. The evidence showed that without the utility

11

approvals and the $2.1 million guaranty from the Tysons, First South would not have participated in the $11 million financing.

Finally, on Fifth Third's claim that the district court erred in assessing the costs of expert witnesses because the experts never testified, we affirm the district court. The court did not impose costs incurred for expert testimony at trial, but rather for testimony obtained in responding to discovery. See Fed. R. Civ. P. 26(b)(4)(E).

Accordingly, the judgment of the district court is

AFFIRMED.